UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| O'BRIAN RANGEL,<br><br>Plaintiff,<br><br>v.<br><br>ENSIGN UNITED STATES DRILLING (CALIFORNIA) INC. and ENSIGN UNITED STATES DRILLING INC.,<br><br>Defendants. | No. 1:15-cv-01042-DAD-JLT<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. No. 35) |

In this putative class action, plaintiff O'Brian Rangel asserts two statutory claims against defendants Ensign United States Drilling (California), Inc. ("Ensign California") and Ensign United States Drilling, Inc. ("Ensign Colorado"), entities providing a labor force to oilfields and off-shore oil rigs at several sites throughout California. (Doc. No. 1.)[1] In essence, plaintiff Rangel alleges that defendants effectuated a "mass layoff" in December 2014, without giving employees a sixty-day advance written notice, as required by the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–09 ("WARN Act") and the California Worker

/////

---

[1] Plaintiff Rangel was initially joined by plaintiff Stephen Hale. However, Mr. Hale subsequently withdrew from this litigation by stipulation of the parties in May 2017. (*See* Doc. Nos. 69, 71.) Separately, defendant Ensign Energy Services, Inc., originally named in plaintiff's complaint, was dismissed pursuant to a stipulation in April 2016. (*See* Doc. Nos. 30–31.)

Adjustment and Retraining Notification Act, California Labor Code §§ 1400–08 ("California WARN Act").

At the outset of this litigation, defendants signaled their intent to move for summary judgment as to whether plaintiff's termination was part of a "mass layoff" either (1) at a "single site of employment" under the WARN Act, or (2) at a "covered establishment" under the California WARN Act. (*See* Doc. No. 29 at 8–9.) The parties agreed that a decision on this threshold question would determine whether and how the litigation would move forward. As a result, on April 21, 2016, the assigned magistrate judge issued a scheduling order that permitted limited discovery on "the issues raised in [defendants' contemplated] motion for summary judgment." (*See* Doc. No. 33 at 1–2.)

Thereafter, on May 16, 2016, defendants Ensign California and Ensign Colorado filed the instant motion for summary judgment. (*See* Doc. No. 35.)[2] Following discovery on the issues addressed therein, plaintiff filed his opposition on June 8, 2017. (Doc. No. 74.) On June 22, 2017, defendants filed their reply. (Doc. No. 77.) The motion came before the court for hearing on July 6, 2017. Attorneys Christopher Kupka, Michael Ershowsky, and Kenneth Remson appeared at the hearing on behalf of plaintiff Rangel. Attorneys David Cooper and Vanessa Chavez appeared on behalf of defendants. The court has considered the parties' briefs and oral arguments. For the reasons stated below, the court will grant defendants' motion for summary judgment.

## BACKGROUND[3]

**A.     Ensign's Employment Model**

Defendants Ensign California and Ensign Colorado are subsidiaries of Ensign Energy Services, Inc. (DMF ¶ 1.) Pursuant to agreements with certain oil exploration and production companies, Ensign California would hire, train, and staff workers at various oil rig sites

---

[2] Defendants' original motion (Doc. No. 34), filed May 16, 2016, was superseded by the corrected version (Doc. No. 35) now pending before the court.

[3] The facts that follow are drawn primarily from the parties' statement of undisputed material facts (Doc. Nos. 35-2, 74-1) ("UMF") and statement of disputed material facts (Doc. Nos. 74-1, 78) ("DMF").

throughout Southern and Central California. (*See* DMF ¶ 3.) At certain sites, Ensign California also provided the oil rig itself. (*Id.*)

At all times relevant to this case, Ensign California's main office was located in Bakersfield, California. (DMF ¶ 2.) Ensign California hired employees through its Bakersfield office. (DMF ¶ 4.) Its human resources ("HR") staff in Bakersfield processed all of these hires and kept applicant records though an internet-based software program. (*See* DMF ¶¶ 6–8.) After evaluating applications, HR staff contacted potential hires. (*See* DMF ¶¶ 9–10.) Once hired, new employees were directed to attend orientation and computer-based training at the Bakersfield office. (DMF ¶ 14.) Generally speaking, Ensign California's management controlled decisions regarding the assignment of its employees to particular worksites. (*See* DMF ¶ 22.) To address particular operational needs, Ensign California could transfer an employee from site to site, without their consent. (*See* DMF ¶¶ 22–24, 26.) On-site rig managers were authorized to terminate rig workers, but they were required to speak to HR staff before finalizing the termination. (DMF ¶ 43.)

On April 3, 2014, Ensign California hired plaintiff O'Brian Rangel as a floor hand or motorman on Rig 609. (UMF ¶ 34.)[4] Rig 609 is located on an off-shore platform (nicknamed "Emmy") in the Huntington Beach Harbor, in Orange County, California—approximately 150 miles from Bakersfield, where plaintiff lived and where Ensign California's main office was located. (UMF ¶ 35.) Except for off-site training sessions, plaintiff Rangel worked exclusively at Rig 609 from April 3, 2014, until his termination. (UMF ¶¶ 34, 49.) Ensign California did not own Rig 609 or platform Emmy; it provided labor to staff Rig 609 pursuant to a contract with California Resources Corporation ("CRC"). (UMF ¶ 38.)

**B.    Work and Supervision at Rig 609**

Plaintiff Rangel, who resided in Bakersfield, stayed at a hotel near Rig 609 during the workweek. (DMF ¶ 40.) Once at the hotel, plaintiff and his coworkers traveled to a nearby pier in a van provided for by Ensign California, and then to platform Emmy by boat. (UMF ¶¶ 39–

---
[4] Plaintiff Rangel was previously hired by Ensign California in 2005 to work at other rig sites. (*See* DMF ¶ 20.)

3

40.) At Rig 609, each rig worker, including plaintiff Rangel, was scheduled to work a shift of approximately thirteen hours per day, seven consecutive days per week, followed by seven consecutive days off. (UMF ¶ 42.)

Ensign California's employees worked under hierarchical and overlapping levels of supervision. On-site rig managers were typically responsible for the immediate supervision of rig workers, including plaintiff Rangel. (UMF ¶ 44.) At Rig 609, four rig managers worked in staggered shifts, and at all times, plaintiff Rangel was directly supervised by one of these rig managers. (*Id.*) However, Ensign California staff at the Bakersfield office were involved in policy creation and regular training of rig workers. Health, safety, and environmental ("HSE") staff, some based in Bakersfield, regularly traveled to locations at or near the rig site to train and test rig workers on safety-related topics. (*See* DMF ¶¶ 33, 35.) Drilling superintendents, based in the Bakersfield office, visited rig sites on a monthly basis. (DMF ¶ 44.) During a typical visit, one such superintendent, Don Fogle, would speak with rig workers, inspect the premises and equipment, and conduct audits with respect to workplace safety. (DMF ¶¶ 45–46.) Rig workers were required to work in accordance with certain job safety analyses ("JSAs"), which detailed the manner in which particular tasks were to be completed. (*See* DMF ¶¶ 37–38.) All JSAs were subject to approval by both an on-site rig manager and a drilling superintendent or drilling manager. (DMF ¶ 37.) Finally, for three to four days on an annual basis, rig workers attended training sessions, conducted by HSE and HR staff at the Bakersfield office. (DMF ¶ 41.)

**C.     Ensign California's December 2014 Layoff**

In late 2014, Larry Lorenz, the head of Ensign California, met with CRC to discuss the potential shutdown of drilling operations as a result of falling commodity prices. (DMF ¶ 54.) On October 22, 2014, Mr. Lorenz instructed Ensign California's recruiter to implement a hiring freeze for all on-rig employees. (DMF ¶ 56.) On December 17, 2014, Ensign California's HR director sent an email to certain employees regarding anticipated layoffs. (DMF ¶ 58.) The email stated, in pertinent part: "Due to the significant decrease in the price of crude oil, Ensign is in the process of mass layoffs and by law obligated to provide a notice to all potentially impacted

/////

employees." (*Id.*)[5] Plaintiff Rangel was terminated from his employment with Ensign California on December 29, 2014. (UMF ¶ 48.) In the thirty-day period preceding plaintiff's termination, from November 29, 2014, through December 28, 2014, Ensign California terminated one employee from Rig 609. (UMF ¶ 51.) In the thirty-day period from December 29, 2014, through January 28, 2015, Ensign California terminated nineteen employees from Rig 609. (UMF ¶ 50.) Plaintiff alleges that his termination coincided with the terminations of over five hundred other Ensign California employees within a thirty-day period. (*See* Doc. No. 1 ¶ 44.)

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, as plaintiff does here, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

---

[5] The email message further advised that employees would receive a formal notice with further explanation of the law, information about the industry, and answers to common questions. (*See* Declaration of Christopher J. Kupka (Doc. No. 76) ("Kupka Decl."), Ex. 29.)

party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party, *see Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing

party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## DISCUSSION

**A.  Federal WARN Act Claim**

The federal WARN Act prohibits employers from ordering a "mass layoff" without providing sixty days' advance written notice of the order to its employees. 29 U.S.C. § 2102(a). The statute was enacted to provide transition time for workers and their families to adjust to the prospective loss of employment and for their communities to prepare for any anticipated economic disruption. 20 C.F.R. § 639.1(a); *accord Bader v. N. Line Layers, Inc.*, 503 F.3d 813, 817 (9th Cir. 2007).

> The term "mass layoff" means a reduction in force which first, is not the result of a plant closing, and second, results in an employment loss at the single site of employment during any 30-day period for:
>
> (i) At least 33 percent of the active employees, excluding part-time employees, and
>
> (ii) At least 50 employees, excluding part-time employees.
>
> Where 500 or more employees (excluding part-time employees) are affected, the 33% requirement does not apply, and notice is required if the other criteria are met. Plant closings involve employment loss which results from the shutdown of one or more distinct units within a single site or the entire site. A mass layoff involves employment loss, regardless of whether one or more units are shut down at the site.

20 C.F.R. § 639.3(c)(1); *see also* 29 U.S.C. § 2101(a)(3). The WARN Act's implementing regulation provides various categorical definitions for the term "single site of employment." *See* 20 C.F.R. § 639.3(i). Whether multiple work locations constitute a single site of employment is a mixed question of law and fact. *Bader*, 503 F.3d at 817.

/////

7

As noted above, defendants move for summary judgment as to a single threshold issue: whether Ensign California's Bakersfield office—rather than Rig 609—constitutes plaintiff's single site of employment for WARN Act purposes, such that he was a part of a mass layoff in late 2014. Plaintiff argues that the Bakersfield office was his single site of employment under the regulatory definitions, either because he was an outstationed worker or because his employment was part of a truly unusual organizational situation. *See* 20 C.F.R. § 639.3(i)(6), (8). Because fewer than fifty employees were laid off from Rig 609 within thirty days of plaintiff's termination, plaintiff would be unable to establish that his termination was a part of mass layoff if Rig 609, by itself, was determined to be his single site of employment. *See* 20 C.F.R. § 639.3(c)(1). Thus, the court will address in turn whether the Bakersfield office may constitute plaintiff's single site of employment under the two relevant definitions.

1. <u>Whether Plaintiff Was an "Outstationed" Employee</u>

Plaintiff first asserts he was an outstationed worker, with the Bakersfield office acting as his single site of employment. The WARN Act's implementing regulation provides, in relevant part:

> For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

20 C.F.R. § 639.3(i)(6). While the term "outstationed" is not explicitly defined by the regulation, the Ninth Circuit has observed that "[t]he term most logically connotes a situation where employees live for a short period of time at a certain site, departing for home when the work is done." *Bader*, 503 F.3d at 819; *see also Wiltz v. M/G Transp. Servs., Inc.*, 128 F.3d 957, 962 (6th Cir. 1997) ("'[O]utstationed' employees will obviously live, for some period, at the place where they are stationed, just as towboat employees may live on a towboat for up to thirty days at a

/////

/////

/////

8

time.").[6]  In the absence of a controlling definition for the term, the Ninth Circuit recognized that a group of employees could be considered "outstationed" if they shared a "single site of employment"—i.e., (1) the site to which employees are assigned as their home base, (2) the site from which their work is assigned, or (3) the site to which they report—as defined under § 639.3(i)(6). *Bader*, 503 F.3d at 819 (citing *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145 (3d Cir. 1998), and *Teamsters Local Union 413 v. Driver's, Inc.*, 101 F.3d 1107, 1110 (6th Cir. 1996)). In other words, in the absence of evidence that a particular site satisfies any of these tests, a plaintiff cannot qualify as an outstationed worker under the WARN Act. *See id.*

a. *Home Base*

"[A]n employee's home base is the place from which he leaves at the start of the work period and/or returns to at the end of the work period, or at the very least, where he is physically present at some point during a typical work period." *Bader*, 503 F.3d at 819–20 (citing *Ciarlante*, 143 F.3d at 146; *Driver's, Inc.*, 101 F.3d at 1110).

On summary judgment, plaintiff argues that for purposes of determining his home base, a typical work period should take into account his relationship with Ensign California over the totality of his employment. The court finds no basis for adopting such a broad approach to determining an employee's home base. Under the definition set forth in *Bader*, plaintiff's typical

---

[6] The court rejects defendants' argument that the term "outstationed" necessarily refers to jobs where travel is an integral part of the job. (*See* Doc. No. 77 at 5.) In comments accompanying the promulgated regulations, the U.S. Department of Labor ("DOL") explained:

> In order to cover [the situation of railroad maintenance crews who have no home base] and the situation of *outstationed workers* and *traveling workers who report to but do not work out of a particular office*, that part of the regulation relating to mobile workers [i.e., § 639.3(i)] has been revised to clarify that such workers should be treated as assigned to their home base or to the single site from which their work is assigned or to which they report.

Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16042, 16051 (Apr. 20, 1989) (emphases added); *accord Bader*, 503 F.3d at 819. As is clear from this passage, the DOL distinguishes between the same three types of mobile workers explicitly referenced in § 639.3(i)(6). Thus, the undersigned concludes that outstationed workers must be understood as distinct from, rather than synonymous with, traveling workers.

work period can only reasonably be the seven-day period during which a rig worker reports to Rig 609, works a series of shifts, and returns home. Based on the evidence before this court on summary judgment, it is undisputed that apart from the initial hiring process and periodic trainings, neither plaintiff Rangel nor any of his coworkers at Rig 609 visited the Bakersfield office during a typical work period. To the contrary, the parties agree that the workers at Rig 609 typically traveled from their homes directly to their worksites and returned home at the conclusion of their seven-day work periods. That plaintiff Rangel lived in Bakersfield, near Ensign California's office, is of no import to this analysis. Nor is the fact that some rig workers went to the Bakersfield office to pick up paychecks or for other administrative purposes wholly separate from core functions of their jobs. *See, e.g.*, *Ciarlante*, 143 F.3d at 146–47 (suggesting that a company's headquarters cannot serve as home base where mobile sales representatives only contacted the headquarters to check messages and complete administrative tasks, and where they did not visit the headquarters in the normal course of business).

Accordingly, the court finds no evidence before it on summary judgment which supports a finding that the Bakersfield office was plaintiff's home base for WARN Act purposes.

      b.  *Site From Which Work Was Assigned*

For a particular location to be considered the site from which work was assigned, the court must look to where work originated and where the day-to-day management decisions over employees' work duties occurred. *Bader*, 503 F.3d at 820–21. Activities such as accounting, billing, payroll, and other administrative or personnel functions cannot constitute assignment of work under § 639.3(i)(6). *Id.* at 821 (citing *Ciarlante*, 143 F.3d at 147; *Driver's, Inc.*, 101 F.3d at 1111).

Here, the parties do not dispute that rig workers like plaintiff Rangel were directly supervised by their on-site rig managers. (*See* UMF ¶ 44.) Indeed, there is ample evidence before this court on summary judgment establishing that rig workers typically received instructions from other personnel on the rig, rather than individuals based in Ensign California's Bakersfield office. For example, at his deposition, Mr. Fogle testified that he never issued direct instructions regarding rig operations during a site visit, and that rig workers typically discussed

10

tasks among themselves on-site, during their shifts. (*See* Deposition of Donald R. Fogle (Doc. Nos. 76-37, 80-11) at 94:18–21, 201:18–202:10.) Job descriptions for various on-rig positions indicate that rig workers were expected to report directly to other crew members at the worksite. (*See* Declaration of Vanessa Franco Chavez (Doc. No. 80) ("Chavez Decl."), Exs. C–F.) Finally, plaintiff Rangel himself acknowledges that "orders at my rig were given down a chain of command, from Driller, to Derrickman, to Motorman, to Floorhand, to Roustabout." (Declaration of O'Brian Rangel (Doc. No. 75) ¶ 9.) By contrast, the parties present no evidence on summary judgment suggesting that plaintiff's individual work assignments originated outside of Rig 609. *See Ciarlante*, 143 F.3d at 147 (recognizing the distinction between "the true source" of instructions and "mere conduits through which the instructions passed").

   Rather, the parties' dispute centers on whether and to what extent officials based in the Bakersfield office were also involved in day-to-day management decisions over plaintiff and other workers at Rig 609. The evidence presented on summary judgment suggests that workers at Rig 609 operated within a chain of command extending beyond the on-site rig managers, to drilling superintendents and other more senior officials in Bakersfield. Furthermore, nearly all of plaintiff's work assignments on Rig 609 were subject to a variety of company-wide health and safety policies, including HSE-related policies and JSAs, all of which ultimately required approval by staff in the Bakersfield office. While such evidence tends to show that officials in Bakersfield had some degree of operational control over the manner by which rig workers performed their assigned tasks, it fails to amount to more than the types of administrative and personnel functions that courts have declined to consider in the context of § 639.3(i)(6). *See, e.g.*, *Bader*, 503 F.3d at 821; *Driver's, Inc.*, 101 F.3d at 1108–09, 1111 (holding certain centralized managerial or personnel functions based at a central location—including route assignments, disciplinary action, and decisions concerning safety—are insufficient to deem that location a single site of employment). Moreover, regardless of the administrative nature of Ensign California's corporate structure and policies, the court finds no evidence before it on summary judgment of direct involvement by Bakersfield officials in the day-to-day management of workers on Rig 609. *Cf. Ciarlante*, 143 F.3d at 147–48 (vacating a grant of summary judgment where

there was a genuine dispute as to the source of daily instructions to traveling salespeople); *Driver's, Inc.*, 101 F.3d at 1111 (holding that eleven truck terminals were separate sites of employment, where day-to-day trucking operations were run out of each terminal, despite evidence of certain centralized corporate management functions at the company's headquarters); *see also* 20 C.F.R. § 639.3(a)(4) (defining and distinguishing a single "employer" from "one or more sites of employment under common ownership or control"). Accordingly, the court concludes that the evidence before it on summary judgment, even if viewed in the light most favorable to plaintiff, establishes that the Bakersfield office was not the site from which work was assigned to plaintiff and other workers at Rig 609.

The parties also present evidence regarding how termination decisions were made with respect to workers at Rig 609. Generally speaking, on-site rig managers had the responsibility and authority to terminate workers at the rig site, but they were required to consult with HR staff in Bakersfield before doing so. (*See* UMF ¶ 45; DMF ¶ 43.) As to Mr. Rangel's termination, there is some uncertainty as to whether the ultimate decision to terminate Mr. Rangel—as opposed to another rig worker—was made by a rig manager or by senior officials at Ensign California's Bakersfield office, such as Mr. Lorenz. While the authority to hire and fire employees may be probative of where day-to-day management took place, *see Bader*, 503 F.3d at 821, this court can find no authority suggesting that such evidence is sufficient by itself to establish a single site of employment. Thus, even if one were to determine that staff at the Bakersfield office ultimately hired and fired workers at Rig 609, such a determination could not overcome the clear evidence that day-to-day work assignments originated with the on-site rig managers.

For all these reasons, the court finds no genuine dispute that Bakersfield was not the site from which work was assigned under the WARN Act.

    c. *Site to Which Employees Report*

The site to which an employee reports refers to where management issues work orders and directly reviews a mobile worker's job performance and work product in order to evaluate progress and set goals. *Bader*, 503 F.3d at 821 (citing *Ciarlante*, 143 F.3d at 148). As with the

preceding test, "reporting" for purposes of payroll and other centralized administrative functions is insufficient, standing alone, to establish that a particular site is a single site of employment. *Id.* (citing *Driver's, Inc.*, 101 F.3d at 1110–11).

Plaintiff identifies two types of reports, which related to the work performed at rig sites and which were regularly transmitted to the Bakersfield office for review: (1) "daily drilling reports," automatically generated reports detailing the tasks completed at Rig 609; and (2) "near hit incident" and "environmental incident" forms relating to safety and environmental incidents occurring at the rig site. (*See* DMF ¶ 47; Kupka Decl., Ex. 24.) While these reports summarized events at the rig site, the court finds no evidence before it on summary judgment that either type of report was used as the basis for evaluating a rig worker's job performance or work product. Separately, plaintiff points to evidence that Bakersfield staff verbally approved lists of high-performing drillers, submitted by various on-site rig managers, to be included in periodic Implementation Team meetings with those rig managers at the Bakersfield office. (*See* DMF ¶ 48.) Those verbal approvals alone, however, provide no basis for concluding that staff in Bakersfield was directly involved in reviewing rig workers' performance.[7] Thus, in the absence of evidence that individuals based in Bakersfield were involved in issuing work orders or evaluating job performance, the court finds no legitimate dispute that the Bakersfield office was not the site to which workers at Rig 609 reported.

Viewing the evidence before it on summary judgment in the light most favorable to plaintiff, the court must conclude that plaintiff Rangel cannot establish that the Bakersfield office constituted his home base, the site from which his work was assigned, or the site to which he reported. Accordingly, plaintiff cannot establish that he was an outstationed worker under 20 C.F.R. § 639.3(i)(6).

/////

/////

---

[7] In fact, there appears to be at least some evidence before the court that on-site rig managers were primarily responsible for assessing job performance and taking disciplinary action with respect to rig workers. (*See* Chavez Decl., Ex. G.)

13

### 2. Whether Plaintiff Worked in a "Truly Unusual Organizational Situation"

In the alternative, plaintiff contends that the combination of Ensign California's multiple rig sites should be treated as a single site of employment, based at the Bakersfield office, under the residual definition of the WARN Act's implementing regulation, which states:

> The term "single site of employment" may also apply to truly unusual organizational situations where the above criteria do not reasonably apply. The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

20 C.F.R. § 639.3(i)(8). This definition was included "to maintain some flexibility in the definition of 'single site of employment', to provide for truly unusual organizational situations which DOL could not anticipate." Worker Adjustment and Retraining Notification, 54 Fed. Reg. at 16051.

In addressing the applicability of the residual definition to this case, the parties rely exclusively on two cases from the Court of Appeals for the Fifth Circuit in which that court found a "truly unusual organizational situation." In *Carpenters District Council of New Orleans & Vicinity v. Dillard Department Stores, Inc.*, the Fifth Circuit held that when employees previously housed at a single site were forced to separate into two corporate locations due to space constraints faced by a growing company, the new locations could together constitute a single site of employment under the WARN Act because they remained integrated and individual divisions therein continued to perform the same company-wide functions as they had before. 15 F.3d 1275, 1290 (5th Cir. 1994). In *Davis v. Signal International Tex. GP, L.L.C.*, the Fifth Circuit concluded that a truly unusual organizational situation might also exist when there is regular sharing of staff between two corporate facilities in the same city, in light of evidence that certain employees maintained offices in both facilities, that personnel from one facility regularly visited the other, and that the company used the same security, payroll, and other staff. 728 F.3d 482, 486–87 (5th Cir. 2013).

The facts in this case are readily distinguishable from those described in *Carpenters District Council* and *Davis*. There is no evidence here that multiple worksites resulted from space constraints or that Ensign California's various rig sites host company-wide operations. Nor has

14

this court been presented with evidence on summary judgment of defendants' intent to evade the WARN Act's coverage. Rather, the Bakersfield office functioned as an administrative hub for several discrete worksites and as a central location for the periodic training of workers from those sites. In opposing summary judgment, plaintiff primarily argues that the Bakersfield office should be treated as a single site of employment for workers from all rig sites because it facilitated Ensign California's overarching purpose of profit generation. Such a broad reading of the residual definition would make virtually every corporate headquarters a single site of employment, regardless of how employees interact with it. This court finds no authority to support plaintiff's position on this point and concludes that based on the evidence before it on summary judgment, plaintiff cannot establish that his employment with Ensign California constitutes a truly unusual organizational situation under § 639.3(i)(8). Notably, other courts have also declined to find similar corporate arrangements involving oil rig workers truly unusual. *See, e.g.*, *Sisney v. Trinidad Drilling, LP*, 231 F. Supp. 3d 233, 243 (W.D. Tex. 2017) (finding no evidence of an unusual organizational structure where multiple rig sites within a geographic region operated independently); *Meadows v. Latshaw Drilling Co., LLC*, No. 3:15-CV-1174-D, 2016 WL 3057657, at *7 (N.D. Tex. May 31, 2016) (declining to apply § 639.3(i)(8) to a drilling contractor with a single corporate office, three yards, and thirty-nine geographically dispersed drilling rigs), *aff'd*, 866 F.3d 307 (5th Cir. 2017).

In sum, because the court finds no genuine disputed issue of material fact as to whether the Bakersfield office can serve as plaintiff's single site of employment, summary judgment will be granted in defendants' favor as to plaintiff's federal WARN Act claim.

**B.     California WARN Act Claim**

The California WARN Act prohibits an employer from ordering a mass layoff at a covered establishment without providing written notice to employees of the covered establishment at least sixty days in advance of such order. Cal. Lab. Code § 1401(a)(1); *see generally MacIsaac v. Waste Mgmt. Collection & Recycling, Inc.*, 134 Cal. App. 4th 1076, 1084–85 (2005). The state statute "was intended to 'supplement[] the federal plant closure law, by requiring notification of layoffs, terminations, and relocations, which affect 499 or fewer

employees'" and to "give communities a chance to prepare for the impact of large layoffs which do not trigger notification under the [federal] WARN Act." *MacIsaac*, 134 Cal. App. 4th at 1090 (quoting S. Rules Comm., Third Reading Floor Analysis of Assemb. Bill No. 2957, at 1, 4 (Aug. 27, 2002)). The term "employer" means any person who "directly or indirectly owns and operates a covered establishment." Cal. Lab. Code § 1400(b). The term "mass layoff" means "a layoff during any 30-day period of 50 or more employees at a covered establishment." Cal. Lab. Code § 1400(d). The term "covered establishment" means "any industrial or commercial facility or part thereof that employs, or has employed within the preceding 12 months, 75 or more persons." Cal. Lab. Code § 1400(a). Similar to his federal WARN Act claim, plaintiff's theory of liability with respect to his state law claim relies on a finding that Ensign California's several rig sites may collectively comprise a single covered establishment.

In light of the statutory language of the California WARN Act and the evidence presented on summary judgment, however, this court must conclude that no reasonable jury could find liability for at least two reasons. First, the statutory definition for the term "covered establishment" is clear and unambiguous: it refers to part or all of a single industrial or commercial facility—not a group of separate facilities. *Accord Viera v. Accredited Home Lenders Inc.*, No. A-07-CA-719-SS, 2009 WL 10669459, at *5 (W.D. Tex. Mar. 11, 2009) (concluding that the term "covered establishment" as used in the California WARN Act is unambiguous after applying rules of statutory interpretation described in *MacIsaac*). Thus, plaintiff Rangel's termination cannot be a part of a "mass layoff" under the California WARN Act as a matter of law, because fewer than fifty employees were laid off at Rig 609. Even if, as plaintiff suggests, this court were to disregard the plain meaning of the term "covered establishment" and construe it broadly to include "single sites of employment" under the federal WARN Act, plaintiff would still be unable to prevail on his state law claim for the reasons set forth above in addressing his federal WARN Act claim. Second, there is no evidence before the court on summary judgment that defendants directly or indirectly owned Rig 609 or platform Emmy, such that they may be considered employers within the scope of the California WARN Act. (*See* UMF ¶ 38.)

Accordingly, because plaintiff's termination cannot be part of a "mass layoff," summary judgment will be granted in defendants' favor as to plaintiff's California WARN Act claim.

**C.     Additional Discovery**

Finally, plaintiff urges the court to deny or delay a decision on the motion for summary judgment until he is able to obtain evidence essential to his opposition to that motion. (*See* Doc. No. 74 at 23–24.) Specifically, plaintiff contends that the assigned magistrate judge improperly precluded discovery on "the overall conduct of the defendant related to its operations, its hiring and firing decisions, [and] its decisions related to decreases in demand." (*See* Doc. No. 52 at 1.) Plaintiff argues that further discovery on those issues, as well as on matters relating to the allocation of Ensign California's workforce across all of its rig sites, is necessary to adequately resolve whether the Bakersfield office may properly be considered plaintiff's single site of employment under the federal WARN Act. (*See* Kupka Decl. ¶¶ 3–5.)

If a non-moving party shows that "for specified reasons, it cannot present facts essential to justify its opposition" to a motion for summary judgment, the court may deny or defer consideration of the motion until the non-moving party has had an opportunity to obtain adequate discovery. Fed. R. Civ. P. 56(d); *see also Metabolife Int'l Inc. v. Wornick*, 264 F.3d 832, 849 (9th Cir. 2001) (noting that this rule requires, rather than merely permits, discovery in such circumstances, and citing *Anderson*, 477 U.S. at 250 n.5). In order to be entitled to relief under Rule 56(d), "[t]he requesting party must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008) (citing *California ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998)). Failure to comply with these requirements may result in denial of discovery. *Id.* (citing *Campbell*, 138 F.3d at 779).

Here, plaintiff seeks further discovery on issues that are not dispositive with respect to the court's determination of plaintiff's single site of employment. For example, evidence of Ensign California's company-wide personnel practices—including hiring, allocation, and firing of its workers—would not help resolve whether the Bakersfield office constituted *plaintiff's* single site

17

of employment, in light of the evidence before the court on summary judgment discussed above. Moreover, evidence regarding market demands for oil and the broader oil industry would have no bearing on whether plaintiff received instructions from or reported to officials in the Bakersfield office. Thus, because this court finds no legal error in the magistrate judge's management of discovery in this case, plaintiff's request for additional discovery in connection with the pending motion for summary judgment will be denied.

## CONCLUSION

For the reasons set forth above,

1. Defendants' motion for summary judgment (Doc. No. 35) is granted;
2. Summary judgment is entered in defendants' favor with respect to plaintiff's federal WARN Act and California WARN Act claims; and
3. This matter is referred back to the assigned magistrate judge for further proceedings consistent with this order.[8]

IT IS SO ORDERED.

Dated: **September 27, 2017**

UNITED STATES DISTRICT JUDGE

---

[8] The parties have indicated throughout this action that resolution of defendants' motion with respect to plaintiff Rangel may not fully resolve potential claims to be brought on behalf of other Ensign California workers who were terminated in late 2014, should new named plaintiffs be added. Accordingly, the parties are directed to apprise the court of their intentions moving forward. If no new plaintiffs or claims are joined, then this action may be dismissed.

18